The Judges severally delivered their opinions.*
R. E. PARKER, J.
This is a Case of very considerable expectation, both on account of the interest depending upon it, and the novelty and importance of the legal principles involved in its decision. *It is to' be regretted, that from the very Constitution of this Court its members are unable to bestow upon a Case of this nature, as full a consideration as it merits. It cannot-be expected that Judges, who are under a sort of physical as well as moral necessity of soon separating, and of deciding the cause before they part, can examine and consider it with as much attention as they could, if it was in their power to postpone delivering their opinions from time to time, and were afforded the opportunity to re-considcr and revolve it in their minds for a considerable time. Feeling and regretting the disadvantages of this situation, I have yet been able to form an opinion which satisfies my own mind, and therefore I do not hesitate to express it.
The circumstances of the case are so fresh in the recollection of every one who hears me, that it would be a needless consumption of time to recapitulate them. Out of these circumstances several questions arise, and the first is, whether the paper in controversy can be received at all as a Will of Lands, it not being subscribed by the Testator, and his name only appearing in the beginning.
If this were really a new question, I am not prepared to say that I should agree in the opinion, that the insertion of the Testator’s name in the beginning of the Will was a signing within the Statute. It would seem, on the other hand, that the Legislature, when they used the word “signed,” in *368 tended it in the ordinary acceptation of that term; and I cannot for a moment doubt, but that it was 'meant to be equivalent to “subscribed.” I agree with Powell, that it .required the ingenuity of school-men, so far to wrest this word out of its natural sense and received interpretation, as to construe it to mean the recital of a name in any part of an instrument, where common form or accident might happen to introduce it; but 1 agree with him also in regarding this forced construction, as the undoubted one of the English Courts, from the making of the Statute, to the time he wrote; a construction, which has since been confirmed. The Case of Bemayne and Stanley, is a direct authority to this point. That Case, so far from being overruled, has been‘repeatedly recognized, and X should now as soon attempt to shake the authority of any other leading Case, as of this. I sit here to expound, and not to make the Taw. I regard it as a dangerous experiment, for Judges rashly to depart from long-settled decisions, because they may not happen to conform to their ideas of right. In mere questions *of property, involving no political or religious rights, it is often better to abide by adjudications probably erroneous, than by disturbing them, to break up the foundations on which the titles to property rest, and thereby introduce the wildest uncertainty and confusion. The Case of Le-mayne and Stanley, and its recognitions, in the English Courts, had settled the construction of the Statute long before the passage of our Act concerning Wills, which uses the very same term, upon the true meaning of which, that Case turned; and it is impossible, without ascribing to the Eegislature the most profound ignorance, to account for this circumstance, but upon the idea that it was intended to be used in the legal sense stamped upon it by the English authorities. I therefore regard it as settled Eaw, that the insertion of the Testator’s name in the beginning of a paper purporting to dispose of either real or personal estate, is a sufficient signing under our Act, and if no other objection exists to it, will raise it to the dignity of a last Will, and entitle it to probat.
The limitations to this principle will be seen hereafter.
As to the objection to the paper on account of its not being published as a Will, I conceive it has no weight. In England, where the publication of a Will-of lands must be in the presence of three or more credible witnesses, numerous questions have arisen as to what amounts to such publication. But the provision in our Act dispensing with attestation if it is wholly written by the Testator, seems to silence all such disputes when it is so written. The fact of its being written as a Will, (as if the Testator does in terms declare it to be his last Will, which he has done in the case under consideration,) is of itself a sufficient publication, and no other is required, if the intention of the ¡ Testator as to making a Will is carried fully into effect.
I have as little doubt upon the question whether the writing the name at the beginning of the Will and the writing all the subsequent clauses, should of necessity 'be one simultaneous act. The dictum of Eord Eldon in the case of Coles and Trecothick, is too loose and unsatisfactory to be entitled to much consideration. It is in fact not even a dictum, but only an inference from a dictum made evidently without much reflection and altogether at random. The whole passage referred to is the most perplexed and ambiguous I have almost ever had occasion to examine, and I think it would be going too far to say that we must *not only adopt the decisions of English Judges, but be guided by the glimmering and uncertain lights which they attempt to shed upon subjects not before, but at á distance from them.
Upon principle, I do not perceive that the signing and the several disposing clauses need be a simultaneous act. This ceremony of signing, it is said, was preferred to the feudal solemnity of sealing, because the seal which at one time, was a sufficient mark of distinction in families, was not so, at the time the Statute of Frauds was passed; and had, therefore, not so strong a tendencj, as signing, to effect the great object of the Statute, namely, the discovery and prevention of frauds. It was no more than an ear mark to the paper, strengthening the other testimony of its genuineness, and identifying the person of the Testator; but could scarcely have been intended as a sign or evidence of its final ratification, since that was done sufficiently by the attestation required by the Statute. Now, whether the signing and the subsequent clauses are all written at the same time or not, this object of the Statute, as I consider it, is not in the slightest degree affected. On the contrary, every new act of the Testator, when he resumes his work, is an additional proof of his continuing intention to make a Will, and a confirmation of the clauses already written. It may be considered in the light of a re-acknowledgment of the signing already made in the beginning of the paper, and a perseverance in the attempt to complete it, as a Will. Of course, the circumstance of the 6th and 7th clauses in this paper being written, (as it is probable they were,) at a different time from the other part of it, has no weight in the judgment I have formed of the case.
Some doubt may have arisen, how far parol testimony dehors the paper, can be introduced, even to prove its posteriority to the Will of 1800. But upon this point also, I have a settled opinion, that it is, under the authorities, admissible. Several cases in England, of inconsistent Wills of the same date, or of no date at all, being void for uncertainty, proceed upon the principle, that evidence dehors, of the priority of one or the other, might be received, if it could have been procured. Such testimony may also be received to ex *369 plain or elucidate an instrument, but not to contradict, vary, or add to it. The Court, too, will infer intention, from the situation of the person or property, *as well as from priority or poste-riority, and therefore will look out of the Will, to the situation of the parties or property concerned, for collecting' inferences of intention — so far, I think, the parol testimony is applicable to the case, and no farther, and I will add, that as to the posteriority of the paper now offered for probat, that testimony is abundant and conclusive.
In the foregoing points I believe there is little or no difference of opinion between the other Judges and myself; and I have therefore bestowed less time in their elucidation, than might, under other circumstances, have been deemed proper. They clear the way to another branch of the subject of more difficulty and doubt, and about which a contrariety of opinion is entertained.
A last Will is defined to be the lawful disposing of that which any one would have done after death. This word disposing or dispositio, signifies an act proceeding from a firm purpose or resolution, and therefore, any thing spokeh or written unadvisedly, is no Will. Swinburne, p. 1, § 4. There must be “animus disponendi,” as applied to Wills, or “animus testandi” as applied to Testaments. If, therefore, a paper be found written by the Testator in manner of a Will, and disposing of his property; but which is neither subscribed with his hand, nor sealed with his seal, nor attested by witnesses under the Statute, a doubt may arise whether this is to be accounted a mere project, sketch or draught, or the Will of the Testator itself. The solution of this question, says Swinburne, p. 971, part 7, $ 13, resteth in variety of circumstances. “If the writing be imperfect,” (I quote his words,) “for that perhaps the Testator doth leave off in the midst of a sentence, and without anj date, or if the same be written in strange characters, or on paper (instead of parchment,) and at great distance between the lines, with divers amendations and corrections, or be found among papers of small value and account: by these circumstances, it seemeth rather a draught or preparation to a Testament, than a Testament itself. But, on the contrary, if the writing be perfect or fully finished, having a certain date of the day, month, and year, and be written with usual and accustomed letters in parchment, without corrections and with small distance between the lines; and also found in some chest of the Testator, among other writings of great value and moment: By these circumstances, *it rather seemeth to be the very Testament itself, than a draught only.”
It appears, therefore, that the “animus testandi,” without which there can be no Will, is a fact to be collected from a variety of circumstances; and that the imperfect or unfinished state of an instrument, is one of them, entitled to no slight consideration; and which with others, may be conclusive.
This was true as it respected Wills of personal, as well as real property, under the Statute of Henry the 8th, and would be true, a fortiori, under a Statute made professedly to correct the mischiefs to which the adjudications under the first Statute gave occasion, and among the rest, this very one, in the Case of Sir Edward Worseley’s Will, “that an unfinished paper as to signature, should be deemed a Will.”
But the difficulty is, in ascertaining what is meant by Swinburne’s expression of a finished and perfect Will. He may be thought to explain himself, when he states in another place, that a Testament may be imperfect in respect of will, either where the Testator having begun to make his Testament, and intending to proceed further at that present, is suddenly prevented by death or some other cause, so that he cannot finish it; or where he is not so hindered at that present time, but after commencing, defers its completion to a future time, and in the mean time, dieth. In this place he argues, that neither kind of imperfection avoids the Will, because respecting that which is done, there is no imperfection of will, and the perfect is not to be hurt by the imperfect. But it is evident here, that he is stating a case of imperfection, consisting merely in the not finishing a paper begun as a Will, and intended to be perfected as a Will; taking it for granted, that the “animus testandi” accompanied the Act. For, otherwise he would be opposed to himself, in the passage where he admits, that the writing being imperfect, even in respect of its not being sealed, or subscribed, or acknowledged before witnesses, although it contains a disposition of goods and the appointment of an Executor, might be a circumstance connected with others, to prove the want of the “animus testandi;” and therefore, of its not being a Will.
The true conclusion seems therefore to be, that the “animus testandi,” is the discriminative characteristic of a Will; that its being in an imperfect or unfinished state, *is still an important circumstance in ascertaining whether it be a mere sketch, or draught, or a Will; but that if there is no doubt about the latter question, in other words, no doubt quo animo the instrument was written, the naked facts of its not being finished, furnishes no objection to it as a Will. I am speaking now without reference to our Act of Wills, but of the decisions under the Statute of Henry the 8th.
And thus, where a devisor commanded another to make his Will, and thereby to devise White Acre to I. S. and his heirs, and Black Acre to I. N. and his heirs, and he had written the devise to I. S. and his heirs, in the lifetime of the devisor, and before the devise to I. N. and his heirs had been written, the devisor had died, yet the *370 devise to I. S. and his heirs had been good.
Here, it is apparent, no question was or could be raised about the “animus tes-tandi. ’ ’ The Testator commanded the other to make his Will; and informed him definitively of its provisions. There was nothing further to be done, and nothing as to his intention, or as to any other disposition of his property, left to inference. All was certain and definitive; and the single ques-' tion was, whether that part of the Will should stand, which had been well made, because another part intended, had not been finished. Whether even under the Statute of Henry the 8th, it would have been held to be a good Will, if the Testator himself had written the first clause in the Case put, and left it, as it was unfinished, and there had been no evidence of his disposing mind, but circumstances opposing the presumption, that Case certainly does not decide.
All that the Case decides, or that Swinburne affirms, is, as I have said, that where there is no question about the “animus testandi,” the mere fact of the paper’s not having the usual conclusion, is not sufficient to avoid it as a good Will. They leave the question of intention as to the unfinished paper, still open, and allow that circumstance to have considerable weight in determining it.
Taking this view of the authorities, I might safely advance to the decision of this Case, in the manner I think it ought to be decided, without troubling myself with questioning their propriety, when applied to controversies arising under our Act of Wills. Yet it may be pertinent todo so, as I think it will greatly strengthen the argument.
*The Statute of Frauds in England, was made eleven years after the remarkable Case of Sir Edward Worseley’s Will, and was probably made with a direct reference to that decision. It provides a remedy for the alarming consideration which arose out of that Case, that such an unfinished paper should be deemed a Will of Hands, and puts that question, in that country, to rest forever, by providing that a Will shall be a perfect instrument, signed by the Testator and duly attested : No unfinished paper can ever be set up as a Will in that country, whilst'the Statute of 29 Charles, exists. When our Act on the subject passed, the occasion of making the Statute in England, and the effect of its provisions in requiring a perfect instrument, were well known ; and no change was probablj contemplated in our Act, except to dispense with witnesses, where the Will was wholly written by the Testator. Under one formula, as has been well remarked at the bar, it is clearly necessary that the Will should be a perfect and finished instrument, and T think no good reason can be given why it should not, under the other, if the only change contemplated in the Statute of Charles, was the substitution of the Testator’s own hand-writing for the attestation of witnesses, where he might be unwilling to call them in to that fact. It would be going, I think, rather too far to saj', that under our Act, a Will of Hands may not only be made without subscription, but without being finished: It would be going farther than Hemayne and Stanley, or than any dictum to be found in Cogbill and Cog-bill, or any other reported Case, and it would, I apprehend, even be going beyond the modern decisions in England, respecting bequests of personal estate.
It is to be remarked, that Swinburne acknowledges that his doctrine, as I have previously stated it, is opposed bjr many writers, and those of great account and authority ; and that it is clearly contrary to the Civil Haw. (a) By that Haw, if a Testamentary paper is begun but left unfinished, and the party lives a sufficient time to have finished it if he chose, the Haw presumes either that he did not choose to finish it, or had not made up his mind concerning it. Judge Cooper, the Annotator upon the Institutes, remarks upon this passage, (b) that the Haw of England is the same *with that there laid down, and cites several authorities, some of which I have, and some I have not examined, in support of his position. Among these are the Cases of Matthews v. Warner, and Griffin v. Griffin, cited at the bar for the same purpose. In the first cage, why the paper of the 27th of December, 1789, was not established as a Will under the authority of Swinburne, it would be difficult to say: All its provisions were complete, and it broke off with the word “and,” which could not have affected any of the previous bequests any more than if it stopped at the word before. Yet, the Judge of the Prerogative Court refused to admit it, because it was incomplete in form and effect, and the deceased had not made up his mind to it or he would have finished it, having sufficient time, &c. to do so after the inception; and then affirming in so many words the proposition I have just quoted from the Civil Haw. The Case of Griffin v. Griffin is to the same effect, and I only mention it, and Matthews v. Warner, for the purpose of shewing the principles affirmed to be true, as a part of the Haw of England, by the Judges who decided them. As some of my brothers have probably examined these Cases more fully than I have had an opportunity of doing, and will allude to them particularly in their opinions, I shall content myself with stating, that they seem to support Judge Cooper, in the opinion he has given concerning the Haw of England in this particular.
If either of the two last views I have taken of this Case is correct, there is an end of it: for if, under our Act in relation to Wills of Hand, or under the English law in relation to personal estate, an unfinished instrument cannot be admitted as a Will, the paper-now offered is in that predicament, and cannot be received, unless a *371 Will of Lands here requires less solemnity than a Will of personal estate in England; which will not be affirmed. That such ought to be our decision, I have no doubt, unless the Law is otherwise settled, because of the consequences which will attend a different one. Every Will of the father of a family, which is commenced by a devise to some of his children, and not ended, would do injustice to the rest; and in one very common case, it would be injustice of such a flagrant and outrageous nature, as to call for Legislative interposition. If a parent, having several children, should devise all his estate to one, intending to charge it with pecuniary legacies to the rest, and should die without carrying *such his intention into effect, and the Courts should support the finished devise because it was perfect in itself, it would present a case of aggravated injustice and hardship, appealing forcibly for relief. It may be said, that such a case could not happen; because, in the same Case, from Dyer and Coke, of the Black Acre and White Acre, it was adjudged, that if the testator had commanded another to make his Will, and devise Black Acre to I. S. and his heirs, upon condition, or with remainder to I. D. and he had written the devise to I. S. and his heirs, but the testator died before the condition or remainder was written, this devise would have been void; and so it undoubtedly would under the Statute of Henry 8; because, as under that Statute, or rather, the adjudications upon it, one man was permitted to write the Will of another, by his directions, parol evidence was necessarily permitted to prove that he had not complies with them. But here, as to a devise of lands at least, no such evidence could be received of the Testator’s intentions; because that would be contradicting, or at least adding to his Will, (which is required to be in his own handwriting,) and by evidence dehors the Will. Suppose, then, in the Case at bar, the Testator, instead of ending at the seventh clause, had ended at that part of the fifth which contains an absolute devise to James, could we receive evidence that he intended to charge the estate with a provision for his wife, the mother of James, and for Cary, his brother, and because it contains no such clauses, declare it void for that reason? I apprehend not; and if not, as in England, under the Statute of Henry 8, it might be done in relation to personal estate; it is an additional reason why a Will of Lands here, ought not to be put on the footing of a Will of personalty there.
I have said, however, that it was enough for me, if I was at liberty to enquire into the “animus testandi” of the Testator in this case, and was not precluded from that enquiry, by the several clauses of the paper being perfect in themselves, and its purporting to be the last Will of the decedent. That I am not, I have already endeavored to shew; and I now proceed to a short examination of the case under this view of it, taking for granted, the principle affirmed by Judge Roane to have been recognized by the Lord Chancellor, in Coles and Trecothick, “that to sustain an objection to the incompleteness of a Will, it must appear upon the face of the Will, that something more was ^intended to be done.” This, perhaps, is going rather farther than the authorities would support the Lord Chancellor in, since I do apprehend that some extrinsic circumstances might be adduced, to strengthen the presumption of incompleteness.
In this view of the case, it is important to consider:
1. That the paper is not subscribed. The signing, to perfect a Will in respect of solemnity, may, as I have already shewn, be in any part of it; and, if that signing is at the bottom of the paper, it will be conclusive upon the paper itself, that i,t is perfect in respect of will. But, surely a signing at the top cannot have this effect, but rather the contrary, since this is not the usual and ordinary mode of perfecting and finishing papers. If a letter was shewn to us, concluding as usual and subscribed, we should say at once, that the letter .was finished, and the inference would be . irresistible, unless the contrary were shewn ; but if the same letter had no such usual conclusion, but was ended abruptly, we should infer the contrary. It is not, therefore, correct to conclude, that because the paper should be thought by the Court to be perfect in respect of solemnity, it is also perfect in respect of will, and that the same arguments would avail in this case upon the question of the “animus testandi,” as if the signing had been at the bottom. A very different conclusion is the true one; for, this paper not being concluded as Wills usually are, and as the Testator seemed by his first Will to think they ought to be, is a weighty objection to it, on the question of intention.
2. The paper is not dated; an objection of the same character as the last.
3. It is interlined, and written with much apparent carelessness, as is evidenced by the abbreviation of P. Y. which could scarcely have been intended to be left in so solemn a paper as a last Will, by a man of Col. Selden’s character and attention to forms.
4. It is written on a half sheet of indifferent paper. If the not writing on parchment be, according to Swinburne,' one circumstance to infer an absence of the animus testandi, the writing on such paper as this ought to have some weight.
5. The Testator’s leaving behind him another Will, uncancelled, is another circumstance similar in its character.
^Lastly. The Testator, in the commencement of this paper, professes it to be his intention to appoint by the same instrument, executors, and to appropriate a fund for the payment of debts; but has done neither. On this point, I . think it unnecessary to compare the evidence minutely, since I could add nothing to what was said at the bar. The list of property *372 found a year after the paper, is not in any manner connected with the paper, unless we take it for granted that the appropriation was not intended to be made in the Will itself, which would, I think, be contrary to the plain import of the words. If, hi'bWéver, the appropriation was to be made dehors the Will, it does not appear by any circumstance that this was the identical one intended; and this defect would of itself, under the express authority of Cord Eldon in Coles and Trecothick, recognized by Judge Roane, in Cogbill and Cogbill, be fatal, since it would shew that something more was intended. His words are, ‘ the observation is just, that as to personal estate, if it appears upon the Will, that something more is intended to be done, and the party was not arrested by sickness or death, that is not held a signing of the Will, which purports that there shall be a farther act.” The proof is strong, if not conclusive, in this Case,' that the paper in question was written some time before the death of the Testator, and certainly before Hay’s deed; and the party was therefore not arrested by sickness from adding to it. I might have noticed the circumstance of the Testator’s not having mentioned his daughter Patsy, in any manner, in this paper, as a,n additional circumstance to prove that something more was intended to be done. But as it might have been written after her death, I shall not press it, except to remark, that the very uncertainty upon this point should have some weight.
The Case of Cogbill and Cogbill, I have very attentively examined, to find if there was any thing in that Case, opposed to my opinion in this. If there be, I have not been able to discover it. That was a paper full}' and completely finished, as was evidenced conclusively by the clause, ‘Lastly, T do nominate and appoint C. G. A. H. and-executors to this my last Will.” On this circumstance, to shew the settled and deliberate intention of the Testator, Judge Roane mainly relies. Its being found in the possession of a friend, its counterpart being deposited *by the Testator himself in one of the most secure places he possessed, and its obvious final character, are the strong circumstances on which he rests. He quotes, it is true, Swinburne’s doctrine in respect of the perfection of Wills, and applies it to the case of a Will of personal estate; but I have already shewn how that doctrine ought to be received; and I will here further remark, that Swinburne only puts the case of a breaking off in the middle of a sentence, as one example of imperfection, but does not exclude others.
‘ I'ih4ve ' then endeavoured to shew, that whether-this paper be a goodwill of Hands, for the want of the final character of the Will in iHemayne and Stanley, or not, or of personal estate, under the later English decisions, we are still at liberty to enquire into the animus testandi of the maker. That we are not precluded therefrom, by the clauses being in themselves perfect, because the decisions or dicta that such clauses make a complete Will, are true only where there is no dispute about the intention. Nor are we precluded therefrom by the signature at the top, because although that perfects the instrument, in respect of solemnity, it does not in respect of will; a distinction clearly stated by Swinburne himself — That in prosecuting this enquiry of the “animus testandi,” the proof is clear against the paper. Erom all which, I conclude, that we ought not to admit it to probat.
DANIEL, J.
This is a motion to prove before this Court, and to have recorded, a writing, purporting to be the last Will and Testament of Miles Selden the elder, deceased, which writing is wholly in his own hand, with his name thereto signed in the beginning in the following manner: “I Miles Selden of the county of Henrico being in the full enjoy-ipent of those mental faculties which it has pleased my Creator to endow me with do declare this my last Will and Testament,” &c. without date; and also, a schedule likewise in the hand writing of the said Miles Selden, but without his name being thereto signed, and also without date — to avail, as in Law they might, as the last Will and Testament of the said- Miles Selden, deceased.
The facts established by the testimony of sundry witnesses, and otherwise, which I consider material to be noticed, *are: that on the 10th May 1800, the said Miles Selden made a writing purporting to be his last Will and Testament, duly executed as' such, and died on the 18th May 1811, and on the 13th June 1811, the same was proved in this Court, and ordered to be recorded: that in the mean time, between the 10th May 1800, and the 18th May 1811, various changes had taken place in the relative situation and affairs of the said Miles Selden, dec’d. both as they affected the number of his children, and the identity and quantity of his property : that the papers now offered for probat, were written wholly by the said Miles Sel-den ; and long after the date of the writing already proved and recorded as his Will; and subsequently to the aforesaid changes in his family and affairs: and that of the papers aforesaid, that which purports to be his last Will and Testament, as first above mentioned, enumerates all his living family including children and wife, and is applicable to his property, such as it was at and about the time of his death, and not applicable to his condition at any time previous to, or on the 10th May, 1800. It also appears by the affidavit of James Selden, one of the parties interested, that the papers now offered for probat were found by him in a desk of the said Miles Selden, deceased, where he usually kept his most valuable papers, long subsequently to 13th June, 1811; and also a considerable time after the death of the person who qualified and acted as the executor of the recorded Will, *373 of date, the 10th May, 1800. And the question to be decided is, shall these papers or either of them, proved as aforesaid, be now recorded.
I am of opinion, that of the papers aforesaid, that which purports to be the last Will and Testament of the said Miles Sel-den, deceased, may be proved and recorded; because it is wholly written by him, and signed by him with his own hand; and that, the other may not be so recorded; because though so written, it is not so signed, nor does it afford any evidence by which it is necessarily connected with the first.
Counsel have read to the Court various reported Cases, some of which appear to support, and others to deny, the correctness of the opinion which I have formed in this Case. In assigning the reasons for my opinion, I shall say but little about those Cases. Not that I feel altogether indifferent about them; nor that I have received no aid from hearing them read and the arguments of Counsel using them; ''nor yet because I think a Judge might not be able, upon a full and close examination of them, to select the truth from the error of conflicting opinions: But because I think Cases decided respecting Wills, are seldom applicable to a present question attended by different circumstances ; and especially, because I have not had time and convenience since this Cause has been argued, to make a full and close examination of the many Cases referred to. I must, therefore, be content to depend chiefly upon principle and reason, for support of the opinion which I give; and not cloud it by reference to authorities not sufficiently examined.
I will observe, that if the written paper, now before the Court, be available for any purpose as a Testamentary disposition of propert3, its validity will not be affected by the circumstance that a written paper of previous execution has already been proved and recorded.
According to Law, a person ma3r make a disposition of both real and personal estate, or of either, by last Will and Testament.» But the requisites of a good Will to pass personal estate, are not the same with those which are sufficient to convey real estate. A Will, therefore, may be good and sufficient to dispose of chattels, which may not be sufficient to dispose of and convey lands; yet, if it be sufficient for the first purpose, it shall be recorded, although it be defective and insufficient for the latter. Is then the written paper before us sufficient for either purpose? As to chattels, a Will must be in writing (except nuncupative) although it may not be signed by the Testator. Blackstone defines it to be, “the legal declaration of a man’s intention which he wills to be performed after his death:” and all that is requisite to make it such legal declaration is, that it should appear that his will, touching the subject disposed of, be settled, and that it be declared by a writing made by him, or with his consent, and by his directions. (Judge Roane’s opinion in Cogbill v. Cogbill, 2 Hen. & Munf. 514.)
The requisites, then, of a sufficient Will (made by a competent person) to dispose of chattels, are, that the Testator declare in legal manner, his intentions which he wills to be performed after his death touching the disposition of his goods; this legal declaration must be in writing; it must shew a settled purpose to dispose of the subject mentioned in a particular manner, after the Testator’s death. Now, in the paper before us, the Testator, Miles Selden, has declared his intentions which,he,,wills to be performed after 'his death, (touching subjects disposed of;) his declaration is legal, and in writing; and shews a settled purpose to dispose of certain goods in a particular manner, by providing for and giving to every member of his family a certain interest, in certain subjects, which he wills to have effect after his death. Why then is this not a “Will in writing as to personal estate?” If it be sufficient for any purpose, it ought to be proved and recorded. But this writing is said to be good for no purpose, and the objections to it are the same whether they affect it as a disposition of land or goods. I will therefore proceed to consider what is a sufficient Will to convey lands; and the reasons which induce me to support the writing before us as a sufficient Will to convey lands, will apply in greater force to support the same, as a sufficient Testamentary disposition of personal estate.
The requisites of a Will (made by a competent person) to convey lands are, 1. _It must be the last Will. 2. It must be in writing. 3. It must be in writing signed by the Testator himself, or some person for him, in his presence, and by his direction. 4. It must be attested by two or more credible witnesses, in his presence. This, if the Will be not wholly written by the Testator himself; but if so written, then it must still be: 1. The last Will. 2. It must be in writing. 3. It must be in writing signed by the Testator. Now, this last state of things, is equal to the first; the attestation of witnesses is dispensed with, and the three requisites last above mentioned, are substituted for the whole power and force of the first four mentioned. In other words, the writing declaring itself to be the last Will and Testament of the writer, who signs it, and being wholly written by him, furnishes the full and complete evidence of its being such a last Will as would or could be afforded by the attestation of two or more credible witnesses, who had subscribed it in his presence, and declaring upon oath to that effect. But the writing before us, declares, 1. That it is the last Will and Testament of Miles Selden. 2. It is a writing wholly lvritten by Miles Selden. 3. It is signed by him, “I, Miles Selden,” &c. Wherefore, then, is it not his true last Will and Testament?
The Counsel for the Defendants object, 1. That a signing, such as the paper before us exhibits, is not, and does not afford, the *374 evidence required by Law, that Miles Sel-den did sign the writing in question ■ as and for his last *Will; and so the ' writing aforesaid has not the third requisite above mentioned, and is not signed by the Testator. And 2. The same Counsel say, that the writing aforesaid, taken altogether, though it may shew that Miles Sel-den had an intention of making a written ■Will, yet it at the same time furnishes the proof'that he did not intend that particular writing and identical paper to be his Will, because it is unfinished, and abandoned in the midst of the subject previously proposed; and*' therefore, is a mere memorandum of a'' thing to be done, which might be done, ol not, at- his pleasure, and is not available as a Will for any purpose, either to dispose of Chattels, or to convey lands. This second objection will bring into consideration the doctrine and rules of Law which respect ‘ ‘the distinction between a will unfinished as to a particular disposition, and one finished'as to' such disposition, but incomplete as to, or not embracing other subjects of interest.”
Before X proceed to examine the above-mentioned objections, I will observe, that although the requisites of a sufficient Will in writing to dispose of goods, and of a sufficient Will to convey lands, are not the same, yet the things which the Law requires respecting either, must be proved to exist in as great perfection and with as much certainty in the one case, as in the other; thus: as to goods, it must be the last Will; it must be in’ writing; as to lands, it must be the last Will; it must be in writing; it must be signed by the Testator. The two requisites mentioned, as to the first, must be proved to exist with as much certainty and in as great perfection, as the three requisites mentioned, as to the last, and vice versa; therefore, the rules of Law applicable to thé one,-are applicable to the other, because the reason is the same. These observations will be applied hereafter.
I will now proceed to enquire in what place and on what part of a written paper purporting to be a Will, must be signed the name of the Testator, to give it validity as such, to convey lands.
■ Every person competent in Law, has the right of disposing of his personal goods by last Will and Testament. The Law does not require such disposition to be in writing. except by restraining nuncupative or oral disposition, to particular circumstances, nor when in writing, to be signed by the Testator. Lands cannot be conveyed in. Virginia by last Will and Testament, except the same be made *in ■ writing and signed by the Testator. The writing is required to secure certainty as to the interest disposed of, and the person to whom conveyed. The signature of the Testator, is required to secure certainty as to the identity of the Testator himself, and to connect him with the writing itself, which purports to be a last Will and Testament : But the Law has not prescribed in what part of the writing, or on what place of the paper containing the same, the name of the Testator must be signed. The office of the signature, which is to identify the Testator, and to connect him with the written paper, is performed, so far as it depends upon itself, equally well, whether it be made at the beginning, in the middle, or at the end; at the top, or at the bottom of any written paper; provided it be made with a view to such identification and connection. When, therefore, a written paper is exhibited, purporting to be a last Will and Testament, signed by the Testator, and is proved to be so signed, in any of the places above-mentioned; which proof is always afforded, when the whole writing and signature is established to be in the proper hand-writing of the Testator, the necessary identification and connection above-mentioned, is made out; and the writing must be received for what it purports in itself to be; unless it can be shewn by countervailing testimony, that such writing was so signed with a different view, and for a different purpose. But, such testimony must be derived from the writing itself, when it is wholly written and signed by the Testator, with his proper hand. Is there, then, any testimony derived from the paper writing before us, to shew that Miles Selden signed it with any other view or for any other purpose, than to identify and connect himself with it, and to adopt for his own, the sentiments which it contains? An answer is offered in the first objection of Counsel for Defendants already mentioned, which is, that the signing of the paper, such as it is, is at the beginning and not at the conclusion of the writing, and so the same is not signed according to our Law respecting Wills. Let the validity of this objection be examined. The term sign, as applicable to the act of writing a man’s name, is not unfrequently used, both in the Statutes of England and in our Acts of Assembly; both in relation to Wills and in relation to contracts. Long before our Acts respecting Wills, and to prevent frauds and perjuries, were enacted, this word was used in the British Acts of Parliament, respecting *the same subjects, and received a legal definition, both bj learned Judges and able Commentators. This legal definition was well known and understood by our Judges, and Lawyers, and Legislators, who enacted our Laws; and who, by adopting not only the particular provisions of the English Statutes, but also the same words and phraseology, adopted also the same construction and meaning, which was well known to be given to them by the English Judges. This I understand to have been the uniform course of decision in this country. The only material difference between our Act of Assembly respecting Wills, and the English Law on the same subject, under the Statute of 29 Car. 11, is, that our Act allows a Will, if wholly written by the Testator, and signed by him, to be good and sufficient without the attestation of witnesses; whereas, the British Statute requires the *375 attestation of witnesses: both require, that the writing should be “signed by the Testator,” to be a good Will. The word signed, therefore, means the same thing in both. In the construction of the English Statute, it has been determined, that the Testator’s name written with his own hand at the beginning of his Will, as “I John Mills, do make this my last Will and Testament,” is a sufficient signing without any name at the boftom. 2 Black. Com. 376. This construction is also maintained by the decision of the Case of Lemayne v. Stanley, read by Counsel from 3 Lev. This decision has been long made. I do not consider it impeached by any authority which I have read, or which has been quoted at the bar. It was certainly rightly made, in the Case for which it was made. The whole Will was finished, sealed, and witnesses called to attest as the final publication; and the Testator’s name written or signed at the top, or beginning, being adopted by him, before the witnesses called to attest, answered all the purposes of certainty, as if his name had been signed by way of subscription at the bottom, and acknowledged by him. Whatever difference of opinion may now exist as to what ought to be regarded as the proper extent of the influence of that Case, I cannot imagine that any serious objections could or would be made to a Will in writing, with the Testator’s name signed at the beginning, perfect in all other respects, and published by the Testator before the requisite number of attesting witnesses, because the Testator’s name was not signed at the bottom. The name signed at the beginning, is adopted as a concluding and final act.
*1 consider, then, that a signing does not necessarily mean a subscribing. In cases of contract, in which the Eaw requires a party to sign a writing before he shall be bound, numberless authorities might be adduced to show that the word “sign” does not necessarily mean subscribe. The Eaw provides, that no person shall be bound for the debt of another, unless his agreement to be so bound, shall be in writing, signed by him, or some other person for him, thereunto lawfully author-ised. Was it ever contended, would it be now contended, that a person intending to pay the debt of another, for a sufficient legal consideration, may not bind himself in writing to do so, without subscribing his name to the written promise or agreement, if he sign his name in any part of the writing containing sufficient words to bind him? As thus: “A. B. presents his compliments to C. D. and promises, (for certain sufficient and legal considerations,) to pay him a debt of $1000, due him by E. F. thirty days after date?” Would not C. D. at the expiration of the time limited, be entitled to demand, and recover by action at Eaw, from A. B. the $1000 mentioned, if there could be no other objection made than that A. B. had not signed his written promise to pay? Most certainly. Would it be decided, that because A. B. had not signed his name at the conclusion of such a writing, that his promise, otherwise obligatory, was void? Unquestionably not. Authorities are unnecessary to be referred to, to maintain so plain a proposition. Signing, then, does not necessarily mean subscribing, in relation to contracts in writing. To maintain that it does so mean, in relation to Wills in writing, is to assert, that the same word in our Legislative Acts must have a different meaning, when the Legislature had it most aptly in its power to avoid this struggle about the import of a word, by using the term subscribed instead of signed, when it was intended that the writing should be void, unless it was subscribed; and by using the word signed, when it was intended that the writing should be valid, if signed by subscription or other signature. We have, then, before us, a paper signed with the name of the Testator, to shew whose Will it is; declared to be his last Will and Testament, by way of publication; in writing wholly written by the Testator, to exclude the necessity of attesting witnesses to prove the signing and publication; we therefore have, according to my judgment, the whole evidence of a sufficiently finished *Will, which the Law demands, published in writing, written wholly by the Testator, and signed by him.
To fortify the conclusion, that the paper being wholly written and signed by the Testator, is a proof substituted instead of attesting witnesses, and must have the effect of evidence derived from such attestation, let us compare the office of both modes of proof which are used to establish the requisites of a sufficient Will; the one not written by the Testator, but attested by witnesses; the other wholly written by the Testator, but not so attested ; but signed in both cases. In both cases, the Will is in writing, and signed by the Testator. When the Will is written by another, the signature of the Testator is proved by the attesting witnesses. When the will is wholly written by the Testator, that fact, and his signature, are proven by testimony establishing his hand-writing. In both cases, the Will must be signed by the Testator, as and for his last Will and Testament; this fact in the first case, is to be established by the testimony of the attesting witnesses ; in the other case, it is established by proof of the hand-writing and signature of the Testator, which writing declares itself to be such last Will and Testament. In both cases, the Will must be published: this is done in the first case, by the attestation of witnesses; in the other, by the act of writing and signing; otherwise, in the latter case, no Will, though written with the greatest accuracy, and signed in any manner, at the beginning, or at the conclusion, could be' published without calling witnesses ; which the Law does not require. It therefore appears to me to be unquestionably true, that the writing wholly by the Testator in the one case, is substituted to the office of attesting witnesses in the other, *376 and draws with it all the consequences of the evidence of attestation and publication ; wherefore this Will must stand in the same force as if it was a Will of like contents, offered for probat with the requisite number of attesting witnesses, who should testify that the Testator published it, and declared to them it was his last Will and Testament.
The conclusion drawn from this mode of reasoning, does not appear to me to be affected by any authorit3 of Cases decided in England, respecting Wills affecting lands; because decisions there are made under a different state of things. There the Will’s being wholly in the hand-writing of the Testator, is a circumstance of no avail; here, it is all *powerful, it is equivalent to attestation and publication. And here, in this State, it is equally powerful, I presume, whether the Will affect real or personal estate.
As to the second objection, which asserts, that the writing before us is a Will for no purpose; and which involves the doctrine respecting unfinished or imperfect Wills; the Cases read at the bar, relate generally to Wills of personal estate, concerning which there existed in certainty no attestation and publication; but the requisite proof of a last Will and Testament was to be inferred, or not, according to circumstances. When these circumstances shewed it to be most probable that the Testator did not intend a particular writing to remain and be taken as the evidence of his wishes as to the disposition of his property after his death, or as and for his last Will and Testament, the Courts in England would not infer that he did so intend, in the absence of proof that he published it as such. The Cases, therefore, which have been read, while they support the observations which I have made, that the requisites of a sufficient Will to dispose of goods, must be proved with certainty, do not impeach •the arguments advanced in support of this Will: For, there is no Case which I know of, or which has been referred to by Counsel, that proves, according to my understanding, a Will to have been wholly rejected for imperfection in some particular, for uncertainty in some particular, or for being unfinished as to some particular disposition, being perfect, certain and finished as to other dispositions, respecting which Will, the proof which the I/aw requires was exhibited as to the making and publishing thereof. On the contrary, whenever such proof has been made, the Will has been received, although it cannot be carried into execution as to the things left imperfect and unfinished for want of certaintj'. I conclude, then, that whenever we have a Will before us, certain, finished, and complete, as to any purpose proved by the testimony required by I/aw, it must be received pro tanto; and that a Will proved and established by the hand-writing of the Testator, is. not less to be regarded than a Will of like contents, proved by attesting witnesses ; and that the same construction must be put upon one, as upon the other; and that if a Testator professes an intention of making some dispositions which he does not make, but omits by calling on witnesses to attest his Will, as it is, and so publishes it; the Will is good as to the subjects well devised, and the ^Testator is considered to have abandoned the intention which he once had of making further dispositions; the same inference must follow in relation to a Will wholly in his own hand-writing; it is finished when he chooses to add no more.
The above conclusion is not averted by considering, that when, in the one case the witnesses are called and attest the Will, we have a certainty that, the Will-is finished according to the wishes of the Testator, which we have not by the signature at the beginning, when the Will is wholly written by the Testator, and there be no attesting witnesses. Because, in either case, the contents of the Will are the same, and there is the same imperfection; in either case, he is equally at liberty to abandon intentions previously avowed, and to remain satisfied with the dispositions he has made, so far as he has written them; in either case, he may postpone making further dispositions for further consideration, and may adopt and sanction what is written pro tanto; this he does by calling witnesses to attest in the one case, and by ceasing to write in the other; in the latter case, this conclusion is necessary, and cannot be repelled but by evidence derived from the writing itself; because the I/aw makes the writing itself the evidence of itself, as I have already observed, when speaking of the office of the signature, and requires no attesting witnesses. When, then, a Testator chooses to add nothing further to his Will, he may stop writing, and adopt the signature at the beginning or top, as and for his present signature in either case. This is true in all cases, or it is true in none.
I think it is established, from what has already been said, and from other authority which has been referred to, that the word signed does not necessarily mean subscribed. ..If this be admitted, then a Will, in all other respects perfect, ■ is not' vbid for the want of a signature by way of subscription, if it be otherwise signed. What, then, shall be the evidence of perfection? That it be in formal and technical words? Then none could write his own Will, but one learned in the I/aw. That it should dispose of all the estate belonging to the Testator? Then it would depend not upon the signing, but upon other proof, a multitudinous testimony of what belonged, to the Testator at the time of his death. That it should conform, in all respects, to what the Testator proposed at the time of commencing the work? Then he shall not change his mind, nor fail in the least partic*ular to write his Will as to all things mentioned in an unnecessary preamble ; for, although the things omitted be unimportant, yet as the Testator has declared an intention to make some arrange *377 ment about them, and has omitted it, it is evident that the work proposed is not finished, and therefore the Will is unfinished and void! For, whether the things omitted be important or not, avails nothing; the work is only finished when all is done that was proposed. This is the criterion by which signing is allowed to be equivalent to subscribing, shewing that it must be the finishing stroke to the whole work.
But, if what is just above said be rejected as extravagant, and it be said, as more rational, that the objection shall prevail only when things material are omitted : then I ask, to what extent material? Of little value or of great value? The rule then ceases to be certain, and is, therefore, no rule. The Raw gives a rule certain — the Will must be signed.
There can be no doubt, that if the Testator writes his Will wholly with his own hand, and subscribes his name thereto, that then he has signed it, and the hand-writing is wholly substituted, instead of publication and attestation by witnesses. When will this consequence of the evidence of the hand-writing, cease in all its force? It can only cease when it is determined that signed, means subscribed. For -if signing otherwise than by subscribing, be sufficient in any case, then the proof of each act of writing the name, whether it be placed at the beginning or at the conclusion, at the top or at the bottom, being the same, the effect must be the same.
The term “signed,” must have a determinate meaning. It means the act of writing the name, at the conclusion of the Will, absolutely; or it does not. If it admits of any conditions, then the act of signing may be manifested by a subscription or other signature. If it admits of no conditions, then the Case of Lemayne v. Stanley is over-ruled in toto. If it admits of conditions as to place, then signing either by way of subscription or other signature, is absolutely sufficient. For, the Raw has given no rule by which to determine when the act of signing the Testator’s name shall be sufficient, as it respects the place of the signature; it only declares that his name shall be “signed;” we cannot establish any such rule. If in one' case, according to its circumstances, we say . signing by subscribing is necessary, *and in another case a difieren t mode of signing is sufficient according to other circumstances, we make a discrimination which our Act of Assembly does not authorise; and cause the validity of a Will to depend, not upon the proof of the hand-writing and signature of the Testator, but upon the proof of these other circumstances. The Statute has confined us to these expressed circumstances, to wit: the signing of the Will, and the writing wholly by the Testator. How can we say that these circumstances may be sufficient or otherwise, according to the proof of other circumstances not furnished by the Will itself, when the Statute declares them to be sufficient, per se?
It is in vain to require a final character about the Will, as respects its being made, which the Law does not require. If the Testator declares it to be his last Will and Testament in writing, wholly written by himself, with his name thereto “signed;” the Law (our Act of Assembly) says, it shall be taken as such; it adds no conditions, and I shall require none. Whether the contents of such written Will can be carried into execution -wholly or in part, only for the -want of certainty, or on account of other imperfection, is to be discovered generally from the writing itself, and is a subject for after-enquiry, but cannot exclude the probat, if it contains any certain and perfect disposition.
For my own opinion, enough is said : But I will suppose a sound discretion may be exercised by the Court, to determine as to the final character of any writing offered for probat as a Will, upon circumstances other than those which I have mentioned. These circumstances must yet arise, from the contents of the Will itself. Otherwise, a last written Will might be set aside by oral testimony, procured by fraud and perjury. A Will as to Lands cannot be made but in writing, nor can a written Will be set aside by oral testimony. Here, then, is a written Will before us, perfect in itself, as to every subject disposed of; solemn in its form; taking notice of every member of the Testator’s family, and providing for them; concluding, that what he had bequeathed in the several clauses of it, was now given, and that he had nothing to add to a particular son but his good wishes, &c. and of this Will, it is said it ought not to be regarded as final because it appears upon the face of it, that the writer professed a design by that writing, to set apart funds for the payment of his debts, an object dear to his heart, and to appoint executors; which things were not *done; therefore, this writing is not finished, and ought not to stand as a Will for any part, because the writer might have intended to charge some part of the subjects devised with the payment of a portion of his debts.
To the above it may be answered it was not necessary to set apart by Wid, a fund for the payment of debts pit Was not necessary to appoint executors; and the writer might not intend to charge any part of the subjects devised, with the payment of any portion of his debts; such intention cannot be presumed from the writing itself; such presumption cannot arise from evidence extrinsic, because the evidence itself is inadmissible ; and such presumption is expressly excluded by the fact of his having charged some of the devises with the payment of money, and using the expressions in the last clause, ‘as much as I now give to the rest of my children,” comparing what he had now devised in gross and un-incumbered, with what he had previously advanced to his son Miles. But the Law provides for the payment of his debts. But it is said, we must presume that the Testa *378 tor, having avowed an intention of providing a fund for the payment of his debts, had not abandoned .that intention at the close of this writing which is before us; and, that, therefore, it is unfinished, and no Will. There is no necessity for such a presumption; and unnecessary presumptions avail nothing. Besides, the intention avowed was in the word “hereafter;” and not “hereinafter;” and if he did not thereafter make the provision, we may presume that he abandoned the intention, and this presumption is as necessary' as the presumption we are required to make against the Will, and. so both avail nothing.
What rule-then shall be adopted in this and similar Cases? Shall we adopt that which is the necessary result of the evidence before us, or that which may or may' not be true in the absence of evidence to make it certain? Unquestionably that which is the necessary result. What then would follow? When a written Will appears not to be finished in every particular, but is finished as to some particular dispositions, it shall stand for what is finished, unless the'completion of the unfinished disposition, according to the avowed design of the Testator, would necessarily affect what was finished; so that what was done, by consequence, remained also unfinished and but done in part, by reason of its necessary connection and relation to ^something avowedly intended to be done, but was not done, and so there remained no Will fully expressed as to any entire subject. Apply this rule to the Case before us: it does not necessarily appear from this Will itself, that if the Testator had gone on to appropriate a fund for the payment of his debts according to a list he intended to leave, and to appoint executors, that the devises in the Will which are in themselves finished and perfect, would be in any manner affected. So there is no necessity to reject what is done.
The rule or principle thus advanced, is supported by authority. Swinburne, 519, says that, “when a Testator, after he has begun his Will, doth put off or defer finishing thereof, until another time and in the mean time dieth, &c. yet concerning those things already disposed, the. Testament is not void.”
The Case of Butler v. Baker, referred to from 3 Coke’s Rep. 31, goes all lengths to support the grounds which I take. In that Case it is said, “If one commands another to make his Will, and thereby to devise White Acre to J. S. and his heirs, and Black Acre to J. N. and his heirs, and he writes the devise to J. S. in the life-time of the devisor, and before the other is written the devisor dies, yet it is a good Will to J. S. ” Por what reason? Not because the whole intentions avowed by the Testator are written, but because the devise to J. S. is in itself perfect, and would not be necessarily affected by the devise intended for J. N. This is proved by what follows after: “But if he commands one to make his Will, and to devise W. Acre to J. S. and his heirs, upon condition, and he writes the devise to J. S. and his heirs, and before he writes the condition ■ the devisor dies, this is void.” Por what reason? Because if the whole avowed intention of the Testator was written, the devise to J. S. would be different, and that which was not written would necessarily affect that which was written, and so, by consequence no part of the devise was finished and complete.
What has been already said, with the authorities referred to, establish two principles ; the first is, that a writing having all the requisites of a Will, is not void because it does not contain all the avowed intentions of the Testator as to every subject, if it contain all his intentions as to any particular subjects; and the second, by necessary inference, is, that the things requisite, must be proved to exist with *as much and not less certainty and perfection in a Will respecting goods, as in one respecting lands; for, that when in Law, any fact is established by proof, it exists certainly, perfectly, entirely; or, it is not established at all. Hence it follows, that as a Will, respecting chattels, may be valid, being “finished as to some certain dispositions, though unfinished and incomplete as to, or not embracing other subjects of interest:” So a Will respecting lands, maybe valid, being finished as to some devises, though unfinished and incomplete as to, or not embracing other interests intended to be devised; and that the authorities applicable to one case, are applicable to the other, as I have some time ago observed. Wherefore, not only the authorities above referred no, but also the Decision of the Court of Appeals, in the Case of Cogbill v. Cogbill, support the opinion, that this is a sufficient Will, so far as respects its contents, not only for disposing of the chattels, but also for conveying the lands therein mentioned. And it must be admitted to probat, if it be sufficient for either purpose. It is not necessary to say any thing about the time when, or the place where, or the person by whom, the paper in question was found; because a written Will once made, cannot be cancelled but in the manner prescribed by our Act of Assembly.
Finally, I consider all the objections urged against this Will, to resolve themselves into one; which is, that it is not sufficiently “signed.” For, if a writing, such as is before us, was admitted to be signed by the Testator, and attested by witnesses, there could exist no objection to it on account of its contents. But a Will of the same contents, which is sufficient, because it is signed by the Testator and attested by witnesses, is, as I have en-deavoured to prove, equally sufficient, if wholly written by the Testator, and signed by him with his own hand. If, therefore, this Will be signed by the Testator, as it is wholly written by him, with his own hand, then there exists no objection to it on account of its contents. The contents then of this Will, can form no part of the objections to its sufficiency. I have endeavoured *379 to prove, that the word “signed,” used in our Act of Assembly, does not necessarily mean subscribed; and that the expression signed, is satisfied, and the Raw also, if the name of the Testator be written at the beginning or at the conclusion. If I have succeeded in my endeavours, then as the name of the Testator is ^written at the beginning, and the Will is wholly written by the Testator; it is signed; and there remains no objection to it on any account. I am of opinion, that it is signed and may be recorded.
DADE), J.
The Counsel for both the parties in this Case, with peculiar propriety, (as it seems to me,) have deemed it necessary, in the outset, to ascertain as clearly as possible, the rule of construction which this Court should adopt in relation to the word “signed,” in the Act of Assembly concerning Wills. If (as it is said), the name of the Testator in the body of the Will, is a good signing within the Act, and the whole Will being in the Testator’s hand-writing, is quite tantamount to the attestation of the witnesses, according to the first alternative in the Act, then, a Will thus signed, (by which I am always to be understood to mean the name in the body of the Will, as I shall use the term subscribed for the name at the close, to avoid circumlocution,) and thus wholly written by the Testator, stands upon precisely the same ground as a Will executed with the formalities of full subscription and publication, in the presence of the subscribing witnesses: and every argument applicable to the latter Will, would apply equally to the former. I concur with gentlemen in the opinion, that it would be rash, at this day, to discard the authority of Remayne and Stanley, 3 Rev. 1, which, however it may have been complained of by Judges, and elementary writers, has ever been admitted by them all, to be settled Raw. But I go farther. I do not think that Remayne and Stanley is liable to all the cavils which have been made on it. It is law at this day, here, and in England, that a deed sealed and delivered, though never subscribed, is valid. Dor many years of the English history, the subscribing those instruments was unusual; the practice reached probably to the times of the Testator in that Will. It was very natural then for him to believe, that his Will was to be executed in the manner of other solemn instruments: He, therefore, put his seal, and the Court considering the act identified with the agent, by his name, his signum, his mark, appearing in any part of the paper, and its final character being most distinctly indicated by the publication in the presence of the attesting witnesses, I should have ^thought it hard, if sitting m that Case, that the Will should have been over-ruled. I am willing, therefore, to say, that when we used the word “signed,” in our Act, we adopted its construction, as settled in Remayne and Stanley. But that construction was merely, that the name in the body was a mark or sign identifying the Will with the Testator. In England, it never could have been intended to answer the other purposes of a subscription, because those purposes are there necessarily fulfilled by the publication in the presence of the attesting witnesses. But it is required that we should give it a further influence: that'we should make it answer the purposes of a subscription, in evidencing, not merely the identity, but the close, the final character of the paper; and that we should go even further, and give to it and the whole hand-writing of the Testator, the corresponding influence of publication in the presence of the witnesses, for which it is said it is substituted. Erom whence are these constructions derived? Assuredly not from the English Raw, and as certainty not from the principles of sound reason. I shall not be contradicted in saying that the last act in relation to his Will, a Testator, meaning to execute his Will in the presence of witnesses, would do, would be to call upon those witnesses to attest- So, also, that the last act of a Testator meaning to dispense with those witnesses, by writing his own Will, would be to subscribe it. Upon principles of common sense, then, can the name at the beginning, and the hand-writing, completely indicate the conclusive character of subscribing and attesting; which almost every man, not a Rawyer, pursuing even the previous steps, (viz. putting his name in the body, and writing wholly in his own hand,) thinks nevertheless necessary to be added, to signify the completion of the transaction? I think not. My inference, then, is, that in every case where the subscription is wanting, the Will is open to this objection of imperfection, on that account; an objection liable to be completely done away by some circumstances, as by publishing in the presence of attesting witnesses, as in Remayne and Stanley; or to be modified and weakened by other circumstances; and so on the other hand, to be strengthened by other indications of imperfection apparent on the face of the Will. If these premises, and this inference, be incorrect, an important consequence ensues. It will not be denied, that a Will executed with all the formalities of the Statute, writing, subscribing and attesting *must be admitted to probat, however imperfect in its provisions. If the writer’s name in the body of a Will, wholly written by himself, and having the words “make this my Will,” or the like, stands completely and to all intents and purposes, in the place of the other legal requisites, and has precisely their effect, then, you can no more object the imperfection and inconclusiveness of the provisions of the Will in the latter, than in the former case. Now, as the great question in this Case arises upon the alleged imperfection and inconclusiveness of this Will of Miles Selden, it seemed to *380 me absolutely necessary, to remove the above difficulty, which presented itself at the very threshold.
In entering- upon the main question, that of imperfection, I assume as a position, that a Will being, in the language of Judge Blackstone, or rather of the Civilians, “the legal declaration of a man’s intentions, which he wills to be performed after his death,” ought to leave no reasonable doubt of its true character. Justice and common sense point to the propriety of this. If a man die intestate, his property passes by Raw to those who are generally the first objects of his care and affection. - His Will may, indeed, provide for the same, but it may disinherit them; and the same rule of construction will prevail in either case. I repeat, then, that Courts should be careful how they adopt principles, or rules of construction, which may lead to such consequences. They should look with a keen eye into the true character of such a paper, when circumstances render that character at all doubtful. The principles which they establish in relation to a Will doing justice to a man’s family, may, at a future day, be invoked, in another case, to its disherison. Upon this point many authorities have been cited; a comparison of the whole of them, will exhibit some contradiction and no inconsiderable degree of confusion. The authority which strikes my mind as the most deserving of consideration, both from its intrinsic testimony and corroborating cases, is that of Matthews v. Warner, 4 Ves. jr. 186. It is the judgment of the Prerogative Court, strengthened by the circumstance of its not having been objected to by the very able Counsel employed in that Case, and most emphatically corroborated by the opinion of the Lord Chancellor upon another branch of the same Case. In page 197, of the above book, it is said, “The grounds, upon which the Court pronounced *against that paper,” (a testamentary paper in the Cause,) “were, that it was incomplete in form and in effect: the deceased could not have made up his mind to it, or he would have finished it; having sufficient time, strength, and opportunity, after the inception. The Testamenta^ Raw as to imperfect or inchoate papers is, that if a party begins a testamentary paper, and leaves it broken off and unfinished, having lived afterwards a sufficient time in health to have completed it, if he thought proper, it must be presumed, in law, that he had either abandoned it, or had not finally made up his mind, that it should take effect.” And this doctrine, it was said, has been universally received. Ret any man read the Chancellor’s opinion, following shortly after, in the same Case, and he will be satisfied that he did not dissent from the positions above cited. It will be remarked, that this decision was on a Will merely of the personalty, and that it was made in the year 1798, nearly sixty years after the Case of Rimbery and Mason, Com. Rep. 451, which, with the Cases therein cited, is the strongest Case that I have met with for the validity of imperfect Wills. This Case is supported by Coles v. Trecothick, (9 Vesey, 249,) where it is said, “That if it appears upon the Will, that something more is intended to be done, and the party was not arrested by sickness or death, that is not held a signing of the Will, which purports, that there shall be a farther act.” Coles v. Trecothick, is recognised by Judge Roane, in delivering his opinion in Cogbill v. Cogbill, 2 Hen. & Munf. 467, as is the Case from Roberts on Frauds, where he in no wise impugns the very strong authority of Roberts in support of my position, but contents himself with shewing its inapplicability to the Case then in hand. Indeed, in reading the opinion of Judge Roane in that Case, I was forcibly impressed with the truth of the observations made by one of the Counsel in this Cause; that it is remarkable with what a steady eye, throughout the whole of his opinion, he fastens on the conclusive and final character of the Will, or Codicil, then under consideration. It strikes me as one of the strongest authorities in favor of the doctrine. It is.very worthy of remark, that, in Matthews and Warner, and Coles and Trecothick, one of the circumstances from which inconclusiveness of intention is drawn is, that of the Testator having had full time to conclude his Will; of his not having been arrested by sickness or death; from which a very reasonable deduction of an ^abandonment of intention, or inde-termination of mind, is deduced. It is certainly a strong circumstance, and will be found to have been one existing in several of the cases of confirmation of imperfect Wills. It may very reasonably be presumed to have existed in the Cases put in Butler and Baker’s Case, 3 Coke’s Reports, for the Scrivener was directed to do an integral act; to devise White Acre to A, and Black Acre to B. He wrote the first clause, and the testator died before writing the other; it must be believed he died suddenly. The same fact will be presumed in the last Case, because the Testator died before the condition could be written ; and, when it is recollected, how frequently men put off writing their Wills, until they are in extremis, the conjecture becomes more probable; no inference, then, of abandonment or change of purpose, could be presumed in those Cases. But those Cases, upon which great stress has been laid, are susceptible of another answer. It is, that it is quite manifest, that in the first Case, the Testator meant to dispose of no more, or perhaps had nothing more to devise, than Black and White Acre. Now,-as the whole subject was before the Court, as well the clause written after the Testator’s death, as that written before, the Court could see that the former was absolutely independent of the latter. And as to the latter Case, if it require any answer, the best would be, that it was actually held imperfect and invalid ; and although the reason assigned is, that an intended condition was not annexed *381 to the estate, yet there is nothing' in the statement from which it can be presumed, that as a single devise, without any condition intended, it would have been confirmed, unless, under circumstances similar to the first statement, the exposition of which is of course applicable to the latter.
Upon principle and the dictates of common sense, which I apprehend furnish excellent rules upon this subject, the doctrine is equally clear. What motive could induce a man having strength and time for the purpose, and setting about his Will, not to perfect it, unless it be the want of information or of determination? The latter is absolutely necessai-y to the Will, and the former may have a most important effect on its provisions. The mischiefs arising from confirming unfinished Wills, whether of real or personal estate, even in cases in which the devises or bequests actually written are substantive, are almost too palpable to ^require being suggested. A man may make absolute bequests of lands or slaves in the first part of his Will, and yet have it constantly in his mind to charge them with raising portions for other devisees, or for paying debts. Conditions of various characters may be intended to be added; as for example, that the devisee or legatee should give up other lands or other slaves before he should take his devise or legacy. Indeed, I am not prepared to say, what might be the effect on the residue not bequeathed. I am not clear, that if a man setting about making his Will and giving certain slaves to one of his children, without words of exclusion, and breaking off abruptly and dying intestate as to all the rest of his property; the legatee, besides his legacy, might not come in distributively in the residue. It cannot be necessary to dwell on the many cases of inconvenience, which would spring from this doctrine.
It may be remarked, that in the above train of Cases, with the reasoning on them, no distinction has been attempted to be drawn between a Devise of lands and a Will of chattels. Ever}' argument deduced from cases of Wills of chattels, applies a fortiori to Devises of lands; because the latter are Statutory conveyances of lands, the alienation of which, throughout the whole of our own and the English Law, has been guarded by solemnities evincing precision and deliberation. A Will of chattels, is a mere testatio mentis, an evidence of the Testator’s purposes, like the note which is adduced to support the promise in an action of assumpsit. But a Devise of lands is the conveyance itself, like the bond or obligation, which is not the evidence of the debt, but the very debt itself. One difference is very important to shew, that the Will of lands must be the very paper, in the language of Judge Roane, which the Testator “signed and published” as his Will. Erom its publication, it passed all lands then actually belonging to the Testator, (if the words were sufficiently comprehensive,) and no after-acquired lands. It would therefore, in many' cases, be of the utmost importance, .to ascertain with the precision of even a single day, the time when the Testator hath put the finishing stroke to his Will, the moment when he stamped it with the im- ■ press of conclusiveness. A clause in Judge Roane’s opinion, in Cogbill v. Cogbill, to be found in 2 Hen. & Munf. p. 510, seems to me worthy of consideration. That clause is, “With respect to a Will of lands, therefore, the identity *of the paper, with reference to its actual execution as a Will, is important, and the very paper exhibited as the Will of the Testator, must have been executed by him, as and for his last Will and Testament. Even in this case, however, it is not essential, that the paper established, should be the identical one intended for his last Will; nothing being more clear, than that a Will of lands duly executed, remains in force, until revoked by another Will also duly executed: an approbation of, and intention to execute another Will, is not sufficient.”
The explanation of the latter part of the clause, which may seem to modify the first part, is easy; for it refers not to an uncertainty of identity in the paper to be set up as a Will, but uncertainty or change of intention, as manifested by subsequent acts affecting a prior Will duly executed; as to which, perhaps, the shortest explanation would be, that the Court never could Judicially see this change or uncertainty of intention, or at least never could act on it, because the Statute excludes it, (see Roberts on Frauds, 370;) as is exemplified in the Case at bar. No body doubts, but that Miles Selden had changed his purposes since the Will of 1800: yet no body doubts, but that that Will must stand, if this now in contest be not received. I think the reasoning of the same Judge, in page 512, of the same book, is not inconsistent with this exposition. It may all be referred to this; that intention, informally or imperfectly expressed, shall not provoke a prior Will duly executed, although it might satisfy the Judges as well, that in fact, the formal Will was not intended to stand.
I have thus endeavoured to shew, from reason and authority, that where a Will merely of chattels, by its provisions, mode of expression, or manner of execution, evinces a suspended intention; or when, from the failure of the Testator to complete his intentions, he having full time and power to do so, an abandonment is disclosed, the Will ought not to be confirmed. I have endeavoured to prove that all these cases are a fortiori applicable to a Will of Hands, and that they are supported by other reasons peculiar to a devise of real estate.
I shall now make the application to the Case at bar; and shall attempt to shew, concisely, that the paper now offered for probat, by its provisions, mode of expression, and manner of execution, evinces an uncertain or suspended intention; and by reason of the time which elapsed *from the writing until Mr. Selden’s *382 death, and other circumstances, is liable, to the objection of abandonment.
■ The very first impressions made upon the mind, on beholding- this paper, are of that character. The last Will of a gentleman of large fortune, and numerous family, whose •education, and habits made him conversant in legal forms and solemnities, and who, by his Will of 1800, had indicated his respect for them, to make and complete his Will on a half sheet of letter paper, leaving on the whole of it, scarce blank space enough for the Clerk to endorse, “The last Will and Testament of Miles Selden,” with the usual' ofScial notes!! Initial letters set for names — unusual abbreviations — the number of slaves in a bequest signified by a numerical figure instead of a word I Interlinea-tions over words not actually stricken out, but underscored, indicating an intention at a future time to strike out or not, according to circumstances; for, if the intention had been perfect, the score might have as readily been run through the words as under them! No executors 1 No date; and no subscription? I will not waste time in commenting on these most striking features of imperfectness as to mode of expression and manner of execution, in the words of the Text. But I will proceed to shew the imperfections in the provisions of the Will: It will be conceded, that one of the most prominent objects of the Testator was to pay all his debts; that “as he has lived, so he might die, just in all his dealings toward men;” he intended to provide a fund for that object, and I infer that he intended that provision to be actually spread upon, and incorporated in his Will; because there is nothing to contradict that idea; and such is the mode which almost every sensible man would have adopted. Nor the like reason, I presume the list of debts would not have been incorporated with the Will, but would have been separate. The list of debts must have preceded the appropriation, because the appropriation would necessarily be graduated by the amount of debts. Time was required for this object. It does not appear ever to have been accomplished, and the paper said to contain the appropriation cannot be incorporated with the Will, for the very cogent reasons enumerated in Roberts on Frauds, 339. How does this affect the provisions of the Will? If the Testator had completed his Will, he would have provided the fund; he would have found his debts very large, for they now exceed $43,000, and they would not have been *a great deal less when he wrote this paper, as I shall by and by shew, that it must have been written within a year of his death; and whilst his health was such that he could not have been in a condition to add much to his pecuniary embarrassments. It is admitted, that nearly all his property is comprised in this Will and Schedule. That in the Schedule would have scarce paid half his debts; the balance of the fund must then have been raised from these very bequests in the Will, and it is probable, that it would not only have swept them (I mean the personal bequests,) but have impinged’ on the lands. But the Testator meant to leave his children both personal and real property; and it is not probable that he would have comprised the whole of the personalty in the appropriated fund. What then? He must have imposed liens on the devises, or what is more probable, have wholly altered his Will, subjecting specific lands and chattels to sale. Although we can only conjecture as to the manner of alteration, we are absolutely certain, that to effect this first object of the Testator’s wishes, a great change in the Will must have been made. Thus, then, a provision in the Will, in itself imperfect, casts a cloud of uncertainty over every other clause and provision in the ' whole Will; and this, as it seems to me, of inevitable necessity. But, this Will is also liable to the presumption of abandonment. From the Cases of Matthews and Warner, ■ and Coles and Trecothick, it would seem, that in all cases of imperfect Wills, this presumption would arise from the single circumstance of not completing, when there was full time and power to have completed. This was the principal point in Griffin v. Griffin, and there the whole period which intervened was onty eight days. In the case of this Will, I infer, that at least three months must have elapsed; for the Will was probably written after the death of his daughter Patsy, in the month of July, 1810, and before executing the deed to Bullock, on the 6th February, 1811. These deductions are made from the circumstance of Patsy’s not being named in his Will, as would have been done by the Testator, in the same way he did Miles, even if he intended nothing for her; and because a part of the property contained in the Will is conveyed to Bullock, and this property would not have been inserted in the Will, if the deed which placed it beyond his control, had been made before the Will. And here let it be observed, that *if other circumstances shall be considered as fixing the date of this paper anterior to his daughter’s death, it adds another testimony to the incompleteness of the Will, as he has not any where in it named Patsy, who can hardly be presumed to have been wholly unnoticed by her father, in a full and perfect Will. Nor ought the omission to name his wife, except incidentally, to be overlooked, in reference to the same point. During these three months, from February 6th, until .the 30th April following, when the deed to Mr. Hay was made, I can see no reason why the Will was not completed, as the Will of 1800 had been, unless that the intention was unsettled, whether arising from motives known only to Mr. Selden, or because he had not been able to make out the important paper, the list of debts, which must have had an influence on his whole Will, cannot be ascertained, and is of no consequence. If I might conjecture, I would attribute it to the latter cause; for one of his most important debts was his *383 liability for his son Cary, for -whose presence he was extremely solicitous; and amongst other reasons, one was, that he might ascertain what Cary could do as to this very debt. For the purpose of giving no more weight to this circumstance than it is clearly entitled to, I have brought the date of the Will up to the latest period at which probably any person would think of fixing it, viz. just previous to the deed to Bullock. But as the testator, both in his Will, and the deeds to Bullock and Hay, has manifested a humane purpose not to separate families, it is to be believed that Flora’s children, if she had any when the Will was written, would have been given to James Selden, with their mother, who is therein willed to him. But, in Mr. Hay’s deed, she and her two children are conveyed : from which circumstances, it is in-ferrable, that the paper in contest was written before the birth of either of Flora’s children, which would assign it a much earlier being, and add considerably to the presumption of abandonment. Indeed, after Mr. Hay’s interview with him, the evidence of abandonment is strong. I thought the argument entitled to much weight, that the disclosures on that occasion, blighted his prospects, and so materially shook all his arrangements, that he might have had no heart to set about a disposition of his property, and might have thought that as the first Will was the simplest, so it had then become the best. It is scarcely to be believed that he had not freely corn-municated with his son *Miles, in the last days of his life, on the whole subject of his Will, as to which he seems to have been generally very unreserved; and Miles, who had no interest either way, proving the Will of 1800, is, in my mind, a strong circumstance to shew that there was an intention in his father wholly to abandon this now offered for probat; which, upon the whole, I think should not be admitted to be proved as a Will, or Codicil, of either real or personal estate.
SMITH, J.
The paper now offered for probat, as the last Will and Testament of Miles Selden, deceased, is objected to on the ground, that it is not executed in the manner and form required by the Act of Assembly, to pass real estate.
1. Because although wholly written by the Testator, and his name appearing in the commencement, still it is not subscribed by him at the foot of the instrument, which is deemed indispensable under the operation of the Act of Assembly.
2. Because if the name appearing in the commencement, be a sufficient signing; yet in this case, the instrument is so imperfect and incomplete on its face, that it cannot be received as a Will.
As to the first point. Our Act of Assembly requires, that a Will to pass lands, shall be in writing, shall be signed by the Testator, and attested by witnesses, except it be wholly written by the Testator, in which case the attestation by witnesses is dispensed with. In giving a construction to this Act, as it regards the signing, if I were to look to the Act alone, without reference to any decision upon the subject, I might feel some hesitation in deciding, that any thing short of the Testator’s subscribing his name at the foot of the Will, would be sufficient to perfect it. But our Act was copied in part for the Statute 29 Charles 2, and only differs in this, that by the provisions of that Statute, attesting witnesses are necessary in all cases of Wills relating to real estate. As to signing-, there is no difference. Shortly after that Statute went into operation, a construction of it was given by the decision in the Case of Lemayne v. Stanley, “That the name of the Testator appearing in the commencement, in the margin, or at the foot of the Will, was a sufficient signing. ” Although some elementary writers have questioned the correctness of this ^opinion, yet I cannot find that it has ever been over-ruled by any Judicial decison. When our legislature copy an English Statute, which had received its construction in the Courts of England, it is to be presumed, that it was designed that it should receive the same construction here; for, if it had been intended otherwise, the circumstance of its being so construed in England, would have induced the Eegislature here, to adopt a different phraseology, and to have put the Act in language which would have prevented this question from ever occurring. I must, therefore, consider the Case of Lemayne v. Stanley, as conclusive authority upon the first point, and that the name in the commencement may be regarded as a signing within the Act.
Before I proceed to express an opinion upon the second point, whether the paper offered, is sufficiently perfect and complete to justify the Court in receiving it as a Will, it is necessary to enquire, whether the schedule which accompanies it, is to be received and considered as connected with it. In Roberts on Frauds, 338-9, the Law on this point is stated to be, “That a paper referred to in a Will, must be incorporated originally into the Will, or be executed according to the Statute, or it must be described in such a way that the Court can be under no mistake as to the paper referred to; and further, it must be a paper then written and in existence.” This authority is no where contradicted or questioned. Eet us apply it then to this Case. The paper in question is not incorporated, it is not executed in the manner prescribed by the Act, for the name of Miles Selden no where appears on it. It is not described in such a way, as that the Court can be under no mistake as to its identity; in fact, there is no sort of description; no such paper is referred to. The expressions are “I direct my Executors hereafter named, to discharge all my just debts, (a list of which will be found with this instrument,) as soon as they can accomplish that desir *384 able object, out of the funds hereafter appropriated for that purpose, that as I lived so I may die, &c.” There cannot arise even an implication, that the funds spoken of for the payment of debts, were to be appropriated by a separate paper of any character. I think the fair construction is, that it was the intention of the Testator, to make the appropriation in the body of the Will; and besides, it does not in any manner appear, that the schedule was written and in existence at the time of writing the paper offered as the *Will. In this view of the Case, there is no principle upon which the schedule can be connected with the other paper.
I come now to the question, whether the paper offered as a Will, is sufficiently perfect to admit it to probat. This paper is not dated, nor can we, by any evidence in the case, ascertain the precise time when it was written; but, if I am not mistaken, it is admitted on both sides, to have been written after the death of Joseph Selden, in 1806, and before the execution of the Deed of Trust to Mr. Hay, the 30th of April, 1811, -which was about 18 days before Col. Selden’s death. There are, however, some circumstances relative to the slaves named in the Will, and afterwards in the Deed of Trust, which seem to prove, that the paper offered as a Will, must necessarily have been written at least eightéen months before Col. Selden’s death; the precise time is probably not material. The supposed defect and imperfection consists in this, that the Testator, at the commencement, manifests a determined disposition and intention to appropriate funds for the payment of his just debts; he also clearly evinces an intention to appoint an executor, and states that a list of debts “will be found with this instrument.” All these intentions, thus manifested, are unexecuted. No funds are appropriated to pay debts; no list of debts is found; no executor is appointed, and the writing breaks off abruptly, without any such conclusion as is usual to such instruments; and, therefore, it is contended, that it should be regarded as an unfinished paper, or a draft for consideration. It is true, that after stating that he had given to his son, Miles Selden, jun. before his marriage, as much as he now gives to the rest of his children, and that he is blessed with an ample fortune and lovely family, he concludes, ‘I have nothing to add, but my cordial wishes for happiness and prosperity,” and thus breaks off. In thus using the words “I have nothing to add,” we must certainly understand his meaning, that he had nothing further to add to the provision already made for his son, Miles Selden, jun. and we cannot fairly construe it is an expression, that he had nothing further to add to the writing.
The Statute of 29 Char. 2, having required, that in all cases of Wills to pass real estate, attesting witnesses shall be necessary, a question like the present could not have arisen under that Statute; for the very circumstance of the publication, and calling upon witnesses to attest it, is Conclusive, that the Testator had completed the Will, and made every disposition which he intended to make: there,'the"publication of the intention, that the paper shall be the Will of the Testator, is expressed, here, in a case like the present, it is to be implied or not, from what appears on the face of the writing. But the decisions of the Courts of England, in cases of Wills of personal estate, may, by analogy, be applied to this Case, and in the very able argument which has been made, a great number of authorities have been referred to. I shall only notice some of those which influence my opinion in this Case. Among those, is the Case of Matthews v. Warner, in 1798, 4 Ves. jr. 197; in that Case, two papers were offered for probat, one dated in 1785, the other in 1789; the paper of 1789, is stated on its face to be a plan of a Will, and after giving several legacies, and revoking all former Wills, breaks off in the middle of a sentence. This paper was rejected, in toto, in the Prerogative Court, upon the grounds, “That it was incomplete, in form and effect; that the deceased could not have made up his mind to it, or he would have finished it, having sufficient time, strength and opportunty, after the inspection. The Testamentary Eaw, as to imperfect or inchoate papers is, that if a party begins a testamentary paper, and leaves it broken off and unfinished, having lived a sufficient time in health to have completed it, if he thought proper, it must be presumed, in law, that he had either abandoned it, or had not finally made up his mind that it should take effect: this doctrine, it is added, has been universally received, and was particularly recognized in the Case of Griffin v. Griffin, decided in 1790.” On this Case, it may be observed, that the objection to this paper, that it was stated on the face of it to be a plan of a Will, was not taken; the only principle upon which the Court rejected it, was, as before stated, its being unfinished; and the paper of 1785, which was recognized by the same Court as a Will, commenced in the same way, that is, it was stated to be a plan of a Will; and although there was an appeal to this decision, in relation to the paper of 1785, there was none as to that of 1789.
The Case of Griffin v. Griffin, 4 Ves. jr. 197, was this: In 1789, he began a paper and having written no more than the commencement of what he meant to do, he was called away to dinner, and locked up the paper; eight days after, he died suddenly ; the questions were, whether this unfinished paper was a revocation of a former paper of *1777, or whether it was to be established substantively and conjunctively with the former paper. It was decided, that the unfinished paper could have no effect whatever, the Testator having lived eight days in health and capable of business, after he had begun that paper, and not having concluded it, the presump *385 tion of Law even if there was no other paper, would have been, that he never meant to finish it, or that it was intended only as a draft for consideration. And that the Case was still stronger, as there was an executed paper, which happens to be the case in the present instance.
Subsequent to this is the Case of Coles v. Trecothick, 9 Vesey, 248, [1804,] in that Case it is said by the Chancellor, that the observation is just, that as to personal estate, if it appears upon the Will that something more is intended to be done, and the party was not arrested by sickness or death, that is not held a signing of the Will, which purports there shall be a farther act.
And in Roberts on Rrauds, 4S3, it is stated that, “it must appear, an'd that from the paper itself, and not from extrinsic evidence, that the writer intended it to operate as it stood when written, without contemplating any further act to be done to give it perfection and full authenticity. ” (This very sentence is sanctioned by Judge Roane, and copied into his opinion in the Case of Cogbill v. Cogbill.) In opposition to those authorities, which are of a modern date, we have been referred to some ancient decisions under the Statute of Henry 8. These Cases are cited to prove, that where a Testator has begun his Will, and puts off finishing it until another time, and dies, yet concerning those things already disposed of, the Testament is not void. As Swinburne, page 522, seems to be very much relied upon, I shall only notice that authority. He states, “That where a draft is found in the Testator’s hand-writing, though not signed nor delivered before witnesses, if it seems perfect, as if it does not break off in the middle of a sentence, &c. and if it is found among papers of value, &c. by these circumstances the paper seems to be rather a Testament than a draft only. ’ ’ Upon this I would remark, that it is affirmed here, that the Will must seem to be perfect, and an example of an imperfection which would defeat it, is given viz: ‘ ‘If it breaks off in the middle of a sentence, &c.’’ but it is not stated that this is the only imperfection which would defeat it; on the contrary, it is concluded with *an, &c. which shews that other examples might be given, I understand Swinburne, that if it does break off in the middle of a sentence, although there might have been two or three devises completed, yet the whole is void and cannot be set up as a Will, but is considered as a draft for consideration. What is the reason of this? Is it not because it thus appears that he has not acted finally upon it, that there is something more meant and intended to be done? Would not the reasoning of the Law be precisely the same, if that fact, in any other manner, appeared upon the face of the instrument? I believe that no decision of any date, or of any Court, has been, or can be produced, where a paper in the hand-writing of the Testator, not signed nor delivered before witnesses, has been established as a Will, it appearing upon the face of the paper that some further dispositions were meant and intended to be made.
If such have been the decisions as to Wills of personal estate, the same principles certainly apply with equal, but I think more force, as to real property. In the Case of Cogbill v. Cogbill, Judge Roane states, “that the paper in that Case, as relative to the disposal of lands is justly abandoned by the Counsel for the appellants; a Will of Lands, (he says,) is different from a Will of personal estate, it must be executed according to the directions of the Statute, being a Statutory mode of conveyance.” The Statute required that the Will shall be signed by the Testator, and I have already said that I would, under certain circumstances, consider the writing the name at the commencement as a sufficient signing, but it should be remembered, that all the authorities on this subject concur in this, that in such case, the name must be written with intent to give authenticity and validity to the instrument. It might then be asked, at what precise moment of time is it, that such a paper becomes a valid Will. Not at the time of signing the name, because at that time the paper is in blank, there is nothing to authenticate and make valid; the name will be considered as written with intent to make valid a Will to be thereunder written, and until it shall be written, it cannot become an authentic and valid instrument. This Case, then, turns upon the question, was the paper before us finished, completed, and intended by Col. Selden as his Will? I think not. 1. It has no date. 2. He states in the paper, that a list of his debts shall accompany it, and none such is found. 3. He states that his *debts are to be paid out of funds to be hereafter appropriated, and there is no appropriation. 4. He states his intention to appoint an executor, which is not done. 5. The paper is interlined, and words underscored. 6. Initials are used, (P. Y. supposed for Pleasant Younghus-band). 7. It is not concluded in the manner such acts are usually done, but breaks off abruptlj'. Besides, Col. Selden was a man of information, and business, well acquainted with the forms of such instruments, and had at the time, a former Will, complete in all respects, signed, sealed, and attested, and which he still preserved. If he had intended, and considered this paper as his Will, would he not have destroyed the other, especially as this last one was of such a character as to make it at least doubtful whether it could be supported as a Will? Under such circumstances, he would not have left the former Will, in itself so complete, and formally executed, standing in opposition to it. No doubt he had intended to make a new Will, but I believe his mind was fluctuating on the subject, and that he had come to no final determination. Upon the whole view of this subject, I am of opinion, that the paper offered for probat, cannot be admitted.
*386 STUART, J.
The question to be determined, is, whether the paper which has been the subject of discussion, is the Will of Miles Selden, deceased. If it has validity, it mus't ■ be as a Will, and not a Codicil. The writer, in the introduction, professes his intention to make a Will, to appoint an Executor, and the whole tenor of the instrument, excludes the idea of its being- a Codicil. Is it then a Will? Was this paper intended to be exhibited in Court, and recorded as an instrument to convey his lands; or are we only to consider it as a project of his intentions on that subject, which he intended afterwards to execute in due form? In support of the first position, it is contended that it is complete: That it professes to be the Will of Miles Selden at the commencement: That it takes notice of his wife and all his children, and professes to point out a fund for the payment of his debts, a list of which he promises to ’ furnish: That although this paper is not subscribed by Miles Selden, the whole of it is in his own hand-writing, and his name appears in the preamble: That on the authority of the Case *of Eemayne and Stanley, this is equivalent to signing the same at the bottom. On the other hand it is contended, that the instrument is incomplete on the face of it: That the strong terms which he uses on the subject of his debts, proves that a provision for that purpose was one principal object in making a Will: That this object was wholly unpror vided for: That he intended to appoint an executor, which was not done: That from the face of the paper, the manner of executing it, and the hand from which it*came, prove it not to have been a final act. In this instrument, the name of Miles Selden no where appears except in the first line. The Plaintiffs contend this is sufficient under the authority of Lemayne and Stanley, and our Act of Assembly: That decision going to shew, that it is sufficient if the name of a Testator be found in any part of his Will, and the Act of Assembly declaring, that proof of its being wholly in his own hand-writing, is equivalent to proof by three witnesses: That if Miles Selden had called upon three witnesses to attest this instrument, however imperfect it may be, it must have been taken for a final act, and that as the testimony of witnesses has been supplied by the proof of the hand-writing, the same consequence must follow. I admit the authority of. Eemayne and Stanley. It is also admitted, that the testimony of witnesses may be supplied by proof of the hand-writing, but I deny the inference that this proof is conclusive as to its final character. The fact is, that from the nature of these different modes of proof, the same conclusion on that point never can follow. It is true, if aman calls witnesses to attest his Will, it is evidence of his having completed it, because no man in his senses would call upon witnesses to attest an act which he never had ' performed; but the other mode of attestation will justify no such conclusion. The name of a Testator is generally found in the first line of this Will, and the proof progresses with the writing, and never can be completed until the instrument itself is complete, and when this proof is restored to,. the Court always may, and ought to en-quire, whether it be the final act of the party. .
. Is this then, the final act of the party? Was this, as in the Case of Eemayne and Stanle3’’, all the signing contemplated by the party? Was his intention with respect to his Will completed, his mind being in no suspense, nor looking to any further or future act of authentication?
*The writing appears to me to answer his question. After making the strong declaration of his intentions of paying his debts, he promises to leave a list of them with his Will, and directs that they shall be paid out of the funds thereafter mentioned. Where were they to be pointed out? In his Will,- unquestionably; but no such fund is pointed out; and it is agreed on all hands, that this, his intention, cannot be effected bj- the list of property which is produced with the writing. That cannot be connected with the Will, either as to the real or personal property which it contains. The paper is not identified by the Will, and if it was, it was not in esse at the time it was written. Roberts is clear on this subject. But it may be alleged, that Col. Selden considered that he had made the arrangement promised, and his mistaking the operation of the Eaw in this respect, ought not to prejudice his Will, or furnish an argument against its perfection. This consideration might have weight in enabling us to judge of his intentions, if it was the fact. But I cannot suppose Col. Selden considered it in that light. The amount of the whole property in the list, agreeably to his own estimate, was wholly inadequate. It appears his whole personal estate, would not have answered the purpose, independent of the debt due the United States; and this we are told has been verified by the sale of all his estate, both real and personal, by his son, who it is conceded has acted correctly in that transaction.
■ In ascertaining what was Col. Selden’s opinion in this case, it is fair to enquire what course he pursued on a similar occasion. In 1800, he executed a Will, in the body of which he pointed out a fund for the payment of his debts: the provisions of his Will for this purpose amounted to one-third part of the whole instrument: he subjected the whole of his estate to the payment of his debts, and divided the residue among his children, and here I may farther observe, he subscribed his name at the bottom of it, to which he affixed his seal, and formed an instrument, complete in all its parts. I infer, therefore, not only from the inadequacy of the fund, (and which he must have known to be such:) from the unsettled state of his mind, as to the appro *387 priation of part of the slaves, but from his mode of authenticating such instruments, by signing and sealing, that he himself did not consider this a final act. But it has been said, that the testimony of the witnesses is conclusive, that the disposition of his estate in this instrument *was in conformity to his intentions, expressed to many witnesses. To this it was replied, that if true, parol evidence cannot make perfect an instrument imperfect in itself, but the fact was denied, and that the weight of evidence was the other way. That, whatever may have been his intention, at the date of the writing, that intention was changed some time before his death, particularly as respected his son Cary, for whom he said he would do little or nothing more than he had done, that of this he spoke prospectively, when he expected to recover from his illness, and calculated on being greatly relieved from ?are through the agency of his son James. It is clear, then, at that period, the deposition contended for could not have been in contemplation. In the course of the examination, I was forcibly struck with the great anxiety he expressed to see his son Cary: It appeared to me, that independent of parental affection, he was anxious to know from him what he might depend upon on the subject of his debts: That, without a knowledge of the extent of his liability for him, he could not arrange that subject to his satisfaction, and that when his situation as to him was ascertained, all hope of carrying his intentions towards his other children into effect, was lost, and that he then relied on the Will of 1800, as best adapted to the situation of his affairs. When I take a view of this whole Case; that the writing was not authenticated by signing and sealing, as was his manner on a former occasion: That he appointed no executor, although of the utmost importance to do so in the then state of his affairs: That he made no revocation of his former Will: That he omitted an earnest request contained in his former Will, to deposit his remains with those of his ancestors: When I consider the loose manner in which the devises are drawn, compared with his former Will, and that it was not dated: When I consider, also, that his oldest son was, with him before, and at his death, and that he probably conferred with him on the subject of his affairs, and that such conference must have led to a knowledge of this paper: And, lastly, and most importantly, when I consider, that there is no adequate fund provided for the payment of debts, independent of the lands devised, and that that fact must have been known to Col. Selden, and that this circumstance not only renders that instrument imperfect and inconsistent with itself, and calculated to defeat the strongest wishes of Col. Selden, I cannot believe he ever considered this a final or valid act.

White, Stuart, Smith, Dade ancl Parker, were of opinion, that the papers offered, should not he admitted to prohat; Brookenbrough, Saunders and Daniel, contra. The opinion of White, J., has not heen sent to the reporter; that of Bocken-isrough, J., was lent to a friend, and has heen mislaid ; and although great diligence has heen used it has not heen found; that of Saunders, J., was not reduced to writing. This accounts for the omission of those three opinions.

 Inst. Lib. Tit. 17,1 7, de nuda volúntate.

 Cooper’s Justinian, 511, in notes.